## PUTNAM *v.* COMMONWEALTH INS. CO.

## PUTNAM *v.* LA CAISSE GENERALE DES ASSURANCES AGRICOLES ET DES ASSURANCES CONTRE L'INCENDRE.

*(Circuit Court, N. D. New York.* November 4, 1880.)

1. REFEREE—FINDING OF FACT.—The finding of a referee upon a question of fact will not be disturbed, except in a case where the finding of a jury upon the same question would be disturbed.

2. INSURANCE—FRAUD—EVIDENCE.—In order to establish fraud in presenting proofs and claim of loss, under a policy of insurance, it must be shown not only that the goods were worth less than set forth, but that a fraudulent valuation was made of the same.

3. SAME—POLICY—AGENT—WAIVER.—A policy duly signed and countersigned was delivered to the agent of the assured by the local agent of an insurance company. It provided by a printed provision that " if the assured shall have, or shall hereafter make, any other insurance on the property hereby insured, or any part thereof, without the consent of the company written hereon, * * * this policy shall be void." It also provided that it was a part of the contract " that any person other than the assured who may have procured this insurance to be taken by this company shall be deemed to be the agent of the assured named in this policy, and not of this company, under any circumstances whatever, or in any transaction relating to this insurance." The policy also contained this clause in writing: " $3,000 other concurrent insurance permitted." It was subsequently found by a referee that, at the time the policy was delivered, the agent of the company knew that the assured had other insurance upon the property to the extent of $6,000.

    *Held,* under these circumstances, that a delivery of the policy was a waiver of the implied prohibition contained in the condition in said policy, permitting $3,000 additional insurance.

    *Whited* v. *Germania Fire Ins. Co.* 76 N. Y. 415.

4. SAME—SAME—NAPHTHA.—A policy of insurance provided : "If in said premises there be kept * * * * * petroleum, naphtha, gasoline, benzine, benzole, or benzine varnish, or there be kept or used therein camphene, spirit gas, or any burning fluid, or any chemical oils, without written permission in this policy, then, and in every such case, this policy shall become void."

    *Held,* such provision did not forbid the use of naphtha upon the insured premises for the purposes of illumination.

5. SAME — SAME — " BURNING FLUID."—Such policy also provided that " if, during this insurance, the above-mentioned premises shall be used for any trade, business, or vocation, or for storing, using, or

**v.**4,no.9—48

vending therein any of the articles, goods, or merchandise denominated hazardous or extra hazardous or specially hazardous, * * * printed on the back of this policy, * * * * * then and from thenceforth, so long as the same shall be so appropriated, applied, or used, this policy shall cease, and be of no force or effect."

*Held*, that "burning fluid" did not necessarily mean any fluid that would burn, when "burning fluid" was classed as "specially hazardous" under such provision.

6. SAME—SAME—NAPHTHA.—*Held, further*, that the policy was only suspended under such clause while the forbidden use of naphtha continued, and that it revived when such use ceased.

7. SAME—SAME—EVIDENCE.—Evidence of a conversation in relation to a surrendered policy of insurance is admissible in order to prove knowledge of an insurance company's agent of other insurance upon the issue of a subsequent policy.

8. SAME—SAME—SAME.—Evidence is admissible to show that the assured did not read the policy at the time it was delivered to him, in order to prove that a mistake was made in the writing of the policy.

Motion for a New Trial.

*Edward C. Risley*, for plaintiff.

*James B. Perkins*, for defendants.

BLATCHFORD, C. J. 1. The defendants contend that the evidence shows that the insured property was burned by the fraudulent practices of the assured. The question is one of fact. The referee has found that the fire arose "from some cause unknown." His finding will not be disturbed except in a case where the finding of a jury on the same question would be disturbed. This is not such a case. On the contrary, on the evidence, a finding that the property was burned by the fraudulent practices of the assured would be set aside by the court.

2. The defendants contend that the plaintiff, through his authorized agent, was guilty of fraud in swearing to and presenting the proofs and claim that he did, in respect to the value of the goods burned. The evidence does not establish that the plaintiff knew that the goods were worth less than the value of them stated in the proofs of loss.

The referee has found, in the first case, that the value of the goods at the time of the fire was "upwards of $12,000," and, in the second case, that their value at that time was

"$12,000." It must be established, not only that the goods were worth less than the plaintiff set forth, but that the plaintiff made a fraudulent valuation of them. The evidence is not sufficient to establish either of these facts.

3. The defendant, in the first case, contends that its policy was void when issued. It contains a printed provision that "if the assured shall have, or shall hereafter make, any other insurance on the property hereby insured, or any part thereof, without the consent of the company written hereon, * * * this policy shall be void." The policy contains this clause in writing: "$3,000 other concurrent insurance permitted." When the policy was issued there was $6,000 other insurance on the property, which continued in force until the fire. The application for the policy in suit was made to an agent of the company in Utica, N. Y., the company being established in Boston, Mass. The policy was signed by the officers in Boston, and was countersigned by the agent in Utica, and was delivered in Utica by him to the agent of the assured.

The policy contains this attestation clause: "In witness whereof, the Commonwealth Insurance Company have caused these presents to be signed by their president, and attested by their secretary, in the city of Boston. But this policy shall not be valid unless countersigned by the duly authorized agent of said Commonwealth Insurance Company." Below that are these words: "Countersigned at Utica, this sixteenth day of October, 1877. J. Carr & Son, agents." The policy contains this provision: "11. It is a part of this contract that any person other than the assured, who may have procured this insurance to be taken by this company, shall be deemed to be the agent of the assured named in this policy and not of this company, under any circumstances whatever, or in any transaction relating to this insurance." The plaintiff claims that the evidence shows that the policy was issued and delivered by J. Carr & Son, with full knowledge that there was already $6,000 other insurance on the goods; that the issuing and delivery of the policy with such knowledge was a waiver of any prohibition against more than $3,000 other insurance; and that J. Carr & Son had author-

ity, as the agent of the company, to make such waiver, not-withstanding the eleventh clause. The referee has found as a fact that, at the time the policy was delivered to the plaintiff by the defendant's agent, the fact that the plaintiff had other insurance on the merchandise to the extent of $6,000 was known to the agent of the defendant. He has found, as a conclusion of law, that the delivery of the policy "by the defendant to the plaintiff, with the knowledge of $6,000 of existing insurance upon said stock of merchandise, was a waiver of the implied prohibition contained in the condition in said policy, permitting $3,000 additional insurance." The defendant excepted to the finding of fact "that, at the time of the delivery of its policy, the fact that there was $6,000 other insurance on the property insured was known to its agent;" and to the conclusion of law "that the delivery of its policy was a waiver of the prohibition contained in the condition in said policy permitting $3,000 additional insurance."

The defendant contends that the finding that the agent knew of $6,000 other insurance was not warranted by the evidence. The plaintiff's agent, A. S. Putnam, who applied for the insurance, says that at the time he did so he told the defendant's agent, Carr, that the plaintiff already had $6,000 insurance, and wanted $2,000 more. Two policies, of $1,000 each, were then issued by Carr & Son to the plaintiff on these goods; one by the defendant and the other by a Pennsylvania company, each dated October 16, 1877. A month or less after that the two policies of $1,000 each were given up by the plaintiff to Carr & Son, and the policy in suit was issued in their place, bearing the same date and running for the same time from October 16, 1877. The $1,000 policy issued by the defendant, and so given up, contained the words, "$3,000 other concurrent insurance permitted." It also contained the same clauses as to the policy becoming void, and as to agency and as to countersigning, as the $2,000 policy afterwards did, and it was countersigned "J. Carr & Son, agents, October 16, 1877, at Utica." Carr testifies that when the original application was made, which resulted in the two $1,000 policies "nothing particular was said;" except that A.

S. Putnam gave an order for $2,000 insurance on the goods. Carr says that he issued the two policies for $1,000 each, and delivered them to Putnam. He adds: "I don't remember anything being said as to the amount of other insurance at that time." Carr further says that when the policy in suit was issued he asked Putnam "how much other insurance he had; he said $2,000 with one agent named Symonds, and $1,000 with Hoyt & Butler, and I wrote the policy accordingly." The fact was that there was one policy of $1,000 with Hoyt & Butler and two policies of $2,500 each with Symonds, and that Carr, instead of writing the $3,000 in the $2,000 policy for the first time, had written it before in the $1,000 policy. Carr further says: "I consented to the amount of insurance. He did not at that time, or at any other time, inform me that he had $6,000 insurance; nothing of the kind was said. I did not say, on his telling me that he had $6,000 insurance, that I would give him $2,000 more; nothing of the kind. What I have testified to is all that was said." "I did not know that Putnam had $6,000 other insurance. I first knew that fact after the fire." On his cross-examination Carr says: "When these first two policies were issued I do not remember certainly whether anything was said as to the amount of the insurance. Mr. Putnam did not say in the second conversation that he had one policy with Hoyt & Butler and two with Symonds; no such thing. He said he had $2,000 with Mr. Symonds. This was previous to the second policy having been delivered." In rebuttal Putnam says: "I did not say to Mr. Carr, at the time the two policies were surrendered and the one in suit given, that I had $1,000 with Hoyt & Butler and $2,000 with Symonds; did not say that at any time."

It is a well-settled rule that the report of a referee as to the facts is, like the verdict of a jury, conclusive, as a general rule, in a case of conflict of evidence, and is, like such verdict, to be set aside only where the finding of fact is clearly against the weight of evidence. There is here one witness on each side. The burden is on the defendant to set aside the finding of the referee. The referee had the witnesses before him. On the part of the defendant it is urged

that the fact that Carr wrote $3,000 is evidence that he so understood it; that he had no motive, if he knew it was $6,000, to put in $3,000; and that Putnam may have had the motive to say $3,000 in the fear that he would not be able to get $2,000 more, if it were known there was $6,000 already. On the part of the plaintiff it is urged (which is the fact) that the plaintiff had permission in the three policies, amounting to $6,000, to insure $19,000 more in other companies, and could have had no motive to conceal the $6,000. A. S. Putnam testifies that he did not read the first two policies when they were delivered to him, and did not examine the policy in suit when it was delivered to him, and that he first noticed the provision as to other insurance when the policy in suit was being used after the fire to make proofs of loss. On the whole evidence the case is not one for disturbing the finding of the referee that the fact of the existence of $6,000 other insurance was known to the agent of the defendant when he delivered the policy in suit to the plaintiff. This fact being so, it must be held that the conclusion of law thereon by the referee was correct.

The case of *Whited* v. *Germania Fire Ins. Co.* 76 N. Y. 415, decided in March, 1879, is a direct authority in point. The policy there contained provisions that if the property should be sold, or if the interest of the assured should not be truly stated, the policy should become void; that any less than a distinct specific agreement, indorsed on the policy, should not be construed as a waiver of any condition therein; and "that any person other than the assured, who may have procured the insurance to be taken, shall be deemed to be the agent of the assured, and not of the company, under any circumstances whatever, or in any transaction relating to this insurance." The policy was issued in 1869, signed by the officers of the company, and countersigned "O. J. Harmon, agent," and was for one year. In 1870 it was renewed for one year, the renewal certificate being signed by the officers, and containing the words "not valid unless countersigned by the duly authorized agent of the company at Oswego," and being countersigned there "O. J. Harmon, agent." Like proceed-

ings took place on a renewal in 1871 for one year. During that year the plaintiff conveyed the premises, and took a mortgage on them. Before the year expired he applied to Harmon for a renewal, and then told Harmon, "the person who had, as agent, as defendant's agent, countersigned the policy and the two renewal certificates," that the premises had been sold, and to whom, and showed him the mortgage, and paid the premium. Harmon said to the plaintiff that he would "make it all right," and gave him a renewal certificate signed and countersigned like the former ones. Harmon was the duly authorized agent of the company at Oswego, and did all of the business of it there except settling losses. In the present case, Carr says: "I received applications for policies, and had authority to write and issue policies, without writing to the company."

In the *Whited Case* the interest plaintiff had in the premises as a mortgagee was not stated in the policy or in the renewal certificates. The defendant contended that the policy was void. The plaintiff contended that there had been a waiver of the requirement that the change of interest of the plaintiff should be indorsed on the policy. The defendant replied that Harmon could not bind the defendant by any such waiver. The court say: "Upon the facts in the case, as settled by the verdict, there was a parol waiver of the conditions rested upon by the defendant, and a parol consent to keep on foot the insurance of the plaintiff, in his new *status* of mortgagee, if Harmon was the agent of the defendant in the dealing for the last renewal, and not the agent of the plaintiff. *Fish* v. *Cottenet*, 44 N. Y. 538; *Shearman* v. *Niagara Fire Ins. Co.* 46 N. Y. 526; *Pechner* v. *Phœnix Ins. Co.* 65 N. Y. 195; *Van Schoick* v. *Niagara Fire Ins. Co.* 68 N. Y. 434; *Bidwell* v. *N. West. Ins. Co.* 24 N. Y. 302." Then, referring to the clause respecting agency, the court say:

"That clause we have held to be forceful in *Rohrback* v. *Germania Fire Ins. Co.* 62 N. Y. 47, and *Alexander* v. *Same*, 66 N. Y. 464. We have not held it so, as yet, further than the scope of the facts in those cases. The case in 66 N. Y. hangs upon the case in 62 N. Y. In the latter case it was held that, as the

insured had contracted that the person who procured the insurances hould be deemed his agent, he must abide by his agreement; and that though, through fault or mistake, that person had, in the application for a policy, misstated to the company the declarations of the assured, whereby there had been brought an untrue representation, yet that, as he had been agreed upon as the agent of the insured, the insured must suffer for the error or the wrong. That case dealt with matters before the issuing of the policy. It is so that the clause in the policy is broad, and takes into the fold of its wording any circumstances whatever, and any transaction relating to the insurance. In its verbal scope it has to do with acts, as well after as before and at the time of the giving out of the policy. But, if the insured is to be now bound as having thus contracted, there must be mutuality in the contract. No man can serve two masters. If the procurer of the insurance is to be deemed the agent of the insured, and Harmon is to be deemed such procurer, he may not be taken into the service of the insurer as its agent also; or, if he is so taken, the insurer must be bound by his acts and words when he stands in its place, and moves and speaks as one having authority from it; and, *pro hac vice* at least, he does, then, rightfully put off his agency for the insured, and put on that for the insurer.

"Hence it was that in *Sprague* v. *Holland Purchase Ins. Co.* 69 N. Y. 128, we held that the same clause, in the policy there put out by that defendant, did not make the insured the principal. * * * In the case in hand the defendant has declared, over the hands of its president and secretary, that a renewal certificate from it will not be valid unless countersigned by the duly-authorized agent of the company at Oswego, New York. It had before sent two such certificates to Harmon, which he had countersigned as such agent and delivered to the plaintiff. The plaintiff had paid to him the premium for those renewals, and he had sent them to the defendant. The defendant treated these two certificates as valid, because countersigned by Harmon. Thereby it asserted that Harmon was its duly-authorized agent. It held

him up to the plaintiff as such. It knew, then, that those certificates had been put out and taken as valid; and it must have known that it was so because Harmon thought, and the plaintiff thought,—and that both had reason, from the conduct of the defendant, to think,—that Harmon was the duly-authorized agent of the defendant. It is too late, after letting those two go out as valid, and the third like certificate has been issued and premium paid, for it to say that Harmon is not the agent of the defendant therein, and that he is the agent of the plaintiff. The defendant must have some living, sentient touch of those doing business with it; and when it reposes confidence in the acts therein, and gives him discretionary power to bind and loose, it is idle to say that he is not its agent thereto. The law is too severe to brook such an absurdity; nor will it hold the plaintiff so strictly to the contract he made, as to permit the defendant to ignore it and take his agent as its agent, and yet make him suffer for all the shortcomings of that person while acting between them, and while under authority from the defendant to act for it. Should it be granted that Harmon was the agent of the plaintiff, even then comes in the rule that one employing the agent of another cannot take advantage from the acts and omissions of that agent to the harm of its principal. It is a rule that if one principal to a contract deal surreptitiously with the agent of the principal, it is a fraud upon the other principal. The defrauded one, if he comes in time, is entitled, at his option, to have the contract rescinded; or, if he elects not to have it rescinded, to have such other adequate relief as the court may think right to give him. *P. & S. P. Tel. Co.* v. *Ind. Rub., Gut. Perch. & Tel. W. Co.* 10 Ch. Appeal Cases, 526. The principle should be applied, in the case in hand, to the aid of Whited. The case, then, is that of the holder of a policy asking for a renewal of it, and making known to the agent of the insurer the facts which have made or will make a breach of some of the conditions in it, and thereupon receiving from that agent a written renewal certificate, after payment and receipt of the premium, and having from him a promise that he would 'make it all right.' The

powers of the agent were such as that the transaction with him was the same as if done with the defendant; it is bound as fully as if it were so. There was thus a perfect waiver of those conditions of the policy, and it remained a valid contract for another term. When the loss insured against happened, the defendant became liable to pay, and has shown no real defence against the action."

. The case of *Whited* was decided with the concurrence of all the judges of the court of appeals. The present case cannot be distinguished from it. The fact that in the *Whited Case* Harmon said that he "would make it all right" does not make this case any weaker than that one. The delivery of the policy by Carr to the plaintiff as a valid contract of insurance was an act of Carr, as the agent of the defendant, asserting such validity, and asserting, in effect, that the policy was issued in view of the statement of A. S. Putnam that there was $6,000 other insurance, and that any statement of a different amount of other insurance, in the policy, was a mistake, and not in accordance with the fact, as known to both parties, and that any provision in that policy making it void because the $6,000 was not written on it was then and there waived. Carr had authority to issue policies without writing to the defendant, and must be held to have been the agent of the defendant in receiving the information as to the $6,000 other insurance, and in making the waiver which on the facts was made.

No distinction can be drawn between this case and a case where, under like circumstances, a party might have stated to the agent correctly the amount of other insurance, and yet nothing was said in the policy as to how much other insurance was permitted. In the *Whited Case* there was, it is true, an entire absence from the policy of any statement of the change of interest, while here there is a statement permitting $3,000 other insurance. But the absence of the statement of the true other insurance is no different from the absence of the statement of the true interest of the insured, although some sum be named in the policy for other insurance. Nor does it make a distinction that the other insur-

ance existed at the time, and was not put on after the policy was issued. In the *Whited Case* the change of ownership recurred before the last renewal. The *Whited Case* is the most recent decision on the subject in the highest court of New York. It was the unanimous decision of the seven judges, in view of all former decisions. Regarding it as a sound exposition of the law, and as applicable to this case, I must follow it.

4. The defendant, in the second case, contends that its policy was avoided "by the use of naphtha and gasoline." The policy contains these provisions: "If, in said premises, there be kept gunpowder, fire-works, nitro-glycerine, phosphorus, saltpeter, nitrate of soda, petroleum, naphtha, gasoline, benzine, benzole, or benzine varnish, or there be kept or used therein, camphene, spirit gas, or any burning fluid, or any chemical oils, without written permission in this policy, then and in every such case this policy shall become void. (4,) If, during this insurance, the above-mentioned premises shall be used for any trade, business, or vocation, or for storing, using, or vending therein any of the articles, goods, or merchandise denominated hazardous, or extra hazardous, or specially hazardous, in the class of hazards adopted by the New York board of fire underwriters, and printed on the back of this policy, * * * then and from thenceforth, so long as the same shall be so appropriated, applied, or used, this policy shall cease, and be of no force or effect."

On the back of the policy is a list of articles under the head of "Classes of Hazards," the word "special" meaning "specially hazardous." The following are marked "special:" "Oil, petroleum, and products, other than specified;" "naphtha, benzine, and benzole;" "gunpowder;" "fire-works;" "phosphorus;" "saltpeter;" "nitrate of soda, when stored with other merchandise;" "camphene, stocks of;" "spirit gas, making or selling, or use of;" "burning fluid, stocks of." The following is on the back of the policy: "The use of kerosene oil permitted, on condition that the same be drawn and the lamps be trimmed and filled by daylight only, provided the quality is of the standard required by the laws of the state in

which this policy is issued, but in no case below the United States standard of 110 Fahrenheit." The referee found that during the occupation of the store by the plaintiff he used kerosene and naphtha for the purpose of lighting the same, using naphtha for the first week he was there and kerosene for the remainder of the time; that naphtha was also used in said store by a stranger named Sayles, on two occasions, to show off a naphtha-burning stove, for the sale of which he had an agency; that there was no naphtha on the premises at the time of the fire, neither was there any kerosene on the premises at that time, except a small quantity—a gallon or two—kept for the purpose of replenishing the lamps used to light the store.

As conclusions of law on this subject the referee found: "(2) The use of naptha or gasoline and kerosene on the premises in question, in the manner herein before described, was not a violation of any of the conditions of said policy. The use of kerosene, if of a certain quality, is expressly permitted. There is nothing in the case to show that the kerosene was not of the quality allowed. The clause under which it is claimed the articles were prohibited is as follows: 'If, in said premises, there be kept  *  *  *  petroleum, naphtha, gasoline, benzine, benzole, or benzine varnish, or there be kept or used therein camphene, spirit gas, or any burning fluid, or any chemical oils.' The said articles were not kept on the premises, within the true intent and meaning of the first part of said clause, as the term 'kept' is clearly employed in contradistinction to the term 'used,' in the concluding portion of the clause, and evidently means the keeping of such articles as objects of merchandise or manufacture. It is quite obvious that the last part of the clause, in speaking of 'camphene, spirit gas, or any burning fluid,' does not refer to the products of rock or mineral oil, such as naphtha, kerosene, etc. The terms, 'camphene,' 'spirit gas,' and 'burning fluid,' are well known to commerce and chemistry, and have a well-understood meaning. Thus, 'camphene' is turpentine purified by repeated distillation; 'burning fluid' is a mixture of camphene and alcohol; and 'spirit gas' is a mixture of the same ingredients in different proportions. This clause should be

construed, not only from the actual signification of the words used, but the evident intent of the whole sentence, according to the maxim, '*noscitur a sociis.*' The character of the prohibition, as to rock oils and their products, is clearly intended to be provided for in the first part of the sentence, and other volatile oils and substances in the last part; and it is absurd to say that the contracting parties intended to repeat in the same sentence a prohibition which had been clearly and carefully expressed before. Even if this were not so, it would seem that, under subdivision 4 of this policy, it is very doubtful whether there would ensue a forfeiture unless the loss occurred during the actual use of the article prohibited upon the premises in question. That clause simply provides for a suspension of the liability of the company while a prohibited article is being used in the premises, and if its use ceases the policy would seem to revive by the force of the agreement itself."

The defendant excepted to the finding of fact "that there was no naphtha or kerosene oil on the premises at the time of the fire, except a small quantity of kerosene;" and to the second conclusion of law "that the use of naphtha or gasoline on the premises, in the manner described, was not a violation of any of the conditions of its policy; that the articles were not kept on the premises within the meaning and intent of the condition of its policy; that the term 'any burning fluid,' used in its policy, does not refer to naphtha;" and, generally, "to the whole of the second conclusion of law, and each part thereof." The exception as to the finding of fact in respect to naphtha and kerosene oil is not insisted on. The referee does not find, as a fact, that any kerosene or naphtha was ever kept on the premises, other than such keeping as is necessarily involved in the facts found—that kerosene and naphtha were used, as found, to light the store, and that naphtha was twice used in the store to show off a naphtha-burning stove. There is no exception by the defendant to a failure to find any other keeping or any other use of kerosene or naphtha. The question is whether the use in fact found avoided the policy. The policy permits the use of kerosene oil of a cer-

tain quality and on a specified condition. It is not found that this permission was departed from. As to naphtha, the prohibition is against keeping naphtha, by name. Other dangerous articles are classed with naphtha, and forbidden to be "kept." Then there is a prohibition against keeping or using certain other articles. Presumably, naphtha, being forbidden to be kept by name, in the first description, was not intended to be included among the articles forbidden to be kept, in the second description; and, not being included among the articles in the second description, is not forbidden to be used, if the use does not involve the keeping within the meaning of the word "kept" in the first description. The use of the kerosene or the naphtha to light the store, or its presence or burning in lamps therein used for lighting the store, cannot be considered as a keeping of the naphtha in the store in the sense of the word "kept" in the first description. No other keeping is found. Neither naphtha nor kerosene is camphene or spirit gas or a chemical oil, or within the expression "any burning fluid."

"Burning fluid, stocks of," is indorsed on the policy as specially hazardous. It does not mean any fluid which will burn, but it means a recognized article known as "burning fluid," and a different article from naphtha or kerosene. Nor does the word "any" change the meaning. There may be several articles, each known as "burning fluid" or "a burning fluid," and each not naphtha or kerosene so as to make it proper to say "any burning fluid." Naphtha being specified in the first description it should have been shown that it was known as "burning fluid" in order to bring it within the second description. Kerosene being allowed to be used, the same thing should have been shown and found as to the particular kerosene used there. Further, the whole policy must be construed together. Although naphtha was indorsed as specially hazardous, and was used, and so was within clause 4, its use both for lighting the store and for showing off the stove had ceased before the fire occurred, and there was no naphtha on the premises at the time of the fire. By clause 4 the policy was to be of no force so long as the forbidden use continued,

but only so long.  Such is the meaning of clause 4.  The policy is suspended only while the forbidden use continues, and revives when it ceases.  In this view, and to give proper and harmonious effect to all the clauses of the policy on the subject, the clause in regard to keeping and using the enumerated articles should be construed as affecting the policy only so long as the articles are kept or used.

5. A. S. Putnam, the plaintiff's agent, was asked on his direct examination as to what was said between him and Carr, the defendant's agent, as to the amount of insurance A. S. Putnam wished on the property at the time he applied for insurance, when the two $1,000 policies were issued to him by Carr.  The question was objected to by the defendant on the ground that the conversation was in reference to a surrendered policy, not the policy in suit, and was therefore immaterial.  The question was allowed and answered.  The evidence was competent.  It tended to show the knowledge professed by Carr as to the prior amount of insurance on the goods in question, and to prove the defence which is held good.

A. S. Putnam was allowed to give evidence, under the defendant's objection, showing that he did not read the two $1,000 policies when they were delivered to him; that he did not examine the policy in suit when it was delivered to him; and that he first noticed the provision as to other insurance, in the policy in suit, after the fire.  This evidence was competent, as, if he did not read and know the contents of the defendant's $1,000 policy and $2,000 policy in respect to other insurance, his prior communication of the amount of other insurance to Carr was left to operate in full force.  The natural inference that he would have read the policies and thus have seen the mistake was negatived, and it was proper thus to negative it.

The contents of the Hoyt & Butler policy were properly excluded.  No other exceptions in regard to evidence seems to be insisted on by the defendant.

The motion for a new trial is denied in each case, and judgment is ordered in each case on the report of the referee, with costs.